# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

FREDRIC GYGI,

        Plaintiff,

                                          No. 2:19-cv-00461-KRS-GBW

v.

CITY OF ARTESIA; DON RALEY;
JUAN REYES; and LINDELL SMITH,

        Defendants.

## **ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS**

Plaintiff Fredric Gygi quit his job as a police officer with the Artesia Police Department ("APD") in lieu of termination following an internal affairs investigation that Gygi claims falsely concluded he had used excessive force and lied. Gygi soon found work with the nearby Dexter Police Department ("DPD"). But while Gygi was between jobs, those responsible for the investigation, Defendants, reported the alleged false findings to the New Mexico Law Enforcement Academy ("LEA"), the state entity that credentials police officers. The LEA began revocation proceedings; and, after hiring Gygi, DPD learned of them. At that point, Gygi alleges, he had to resign from DPD and could no longer find work in his profession. After the LEA dismissed the misconduct complaint, Gygi filed this suit under 42 U.S.C. § 1983 claiming Defendants' "defamation" violated his due process and equal protection rights.

Presently before the Court is Defendants' motion to dismiss Gygi's complaint. (Doc. 6). With the consent of the parties to conduct dispositive proceedings, *see* 28 U.S.C. 636(c), the Court has considered the parties' submissions and heard oral argument on the matter on October 7, 2019. Having done so, the Court concludes Gygi does not plead plausible claims for the

1

deprivation of any constitutional right. Accordingly, the Court **GRANTS** the motion in part and **DISMISSES** the complaint.

## FACTS

On July 18, 2015, while employed as a licensed law enforcement officer with APD, Gygi was dispatched to a call involving Felix Castillo. (Doc. 1, Compl., ¶ 12). Gygi ultimately arrested Castillo and transported him to the local jail. (*Id.* at ¶ 13). A jail official, however, accused Gygi of using excessive force against Castillo and lodged a complaint with APD. (*Id.* at ¶14). An internal investigation ensued. (*Id.* at ¶¶15-24).

Juan Reyes, a fellow officer at APD, investigated. Reyes spoke by phone to use-of-force instructors in New Mexico and Michigan about Gygi. (*Id.* at ¶¶15-17). Reyes, however, failed to show the experts "the video of Gygi's interaction with Mr. Castillo which led to the . . . [the internal affairs] investigation of [Gygi's] alleged excessive use of force based on his alleged use of a choke hold." (*Id.* at ¶18). In a subsequent report, Reyes concluded Gygi used excessive force and wrote "[b]ased on the information obtained from these (2) two known experts in the application of force and current standards of use of force in the police arena. [sic] Both agreed said Officer [Gygi] used the 'Choke Hold' in lieu of other force options." (*Id.* at ¶20).

Reyes' findings prompted Officer Lindell Smith to investigate further. (*Id.* at ¶22). Smith also determined Gygi had used excessive force, and both officers additionally concluded Gygi lied during the investigation. (*Id.* at ¶ 23). Don Raley, the chief of police, was aware of and ratified the investigations of Reyes and Smith. (*Id.* at ¶24). Gygi was presented with the findings of the investigations, and Smith told Gygi he would be fired for using excessive force. (*Id.* at ¶¶25-25). Relying on the investigations, Raley decided to terminate Gygi's employment. (*Id.* at ¶27). On November 22, 2015, Gygi resigned in lieu of termination. (*Id.* at ¶28). For its part,

APD issued Gygi a "Letter of Good Standing." (*Id.*). By 2016, Gygi found work as a police officer with DPD. (*Id.* at ¶37).

On December 14, 2015, before Gygi stated work at DPD, Raley, Smith, and Reyes "published to both the United States Department of Justice ("DOJ") and DPS's Law Enforcement Academy, a[] LEA 90 charging that [Gygi] had used excessive force and was untruthful in the investigation of his alleged use of excessive force." (*Id.* at ¶40). A LEA 90 Misconduct Report is the method by which a police department reports misconduct against a licensed law enforcement officer to the state's licensing authority. (*Id.* at ¶¶38-39). An LEA 90 may lead to discipline up to revocation of an officer's license. (*Id.*). Gygi insists the charges Raley, Smith, and Reyes leveled against him were false and done purposefully so that the DOJ would initiate federal criminal charges and DPS would revoke his license. (*Id.* at ¶40-47).

On June 30, 2016, the LEA sent Gygi a "Notice of Contemplated Action to Suspend or Revoke Your Law Enforcement License" based on the allegations in the LEA 90. (*Id.* at ¶48). Gygi received the NCA on July 1, 2016. (*Id.* at ¶49). At some point, DPD learned of the revocation proceedings and informed Gygi "based upon the recommendation of the district attorney, [Gygi] could no longer fulfill all of his previously assigned duties as a DPD law enforcement officer." (*Id.* at ¶50). Gygi "had no choice but to resign from his job," and left DPD. (*Id.* at ¶51). Since leaving DPD, Gygi has not found employment as a police officer despite applying for many positions. (*Id.* at ¶52). Gygi attributes this failure to the LEA 90. (*Id.* at ¶53).

Following proceedings on the NCA, a hearing officer determined on February 18, 2018 that "Smith's charges that [Gygi] had used excessive force and that he had lied during the Internal Affairs investigation were unfounded." (*Id.* at ¶55). In fact, Smith "admitted [] he was

wrong in charging [Gygi] with using the [lateral vascular neck restraint]," and the hearing officer concluded there was no proof of choking. (*Id.*). As a result, the "allegations and evidence against Respondent [did not] clearly establish that he committed acts of violence or brutality . . . or that he was not untruthful in his reporting of either incident." (*Id.* at ¶57). On April 6, 2018, the LEA board adopted the hearing officer's decision and dismissed the complaint. (*Id.* at ¶58).

Gygi sued Defendants on May 18, 2019. (Doc. 1). Gygi's two-count complaint alleges Defendants (1) deprived him of protected property and liberty interests under the Fourteenth Amendment by publishing defamatory statements, adversely affecting his ability to gain and retain employment as a police officer (Count I); and (2) violated his right to equal protection by treating him, "a class of one" differently than other employees when they published defamatory statements against him (Count II). (*Id.* at ¶¶69-81). The instant motion to dismiss followed.

## STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a pleading within its four corners. *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). A complaint is sufficient when it "allege[s] facts that, if true, state a claim to relief that is plausible on its face." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2014) (internal quotation marks and citation omitted). "Plausibility" asks whether, under the substantive law that governs the claims alleged, the plaintiff has pleaded facts that "raise a right to relief above the speculative level." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012); *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008). In determining if a complaint survives a motion to dismiss, the Court must assume the truth of the facts in the pleading, take those facts in the light most favorable to the plaintiff, and assess whether they give rise to a

reasonable inference that the defendant is liable in light of the applicable law. *See Mayfield*, 826 F.3d at 1255.

## DISCUSSION

Defendants argue Gygi's complaint is time barred and fails to adequately plead the deprivation of any clearly establish constitutional right. They also raise the defense of privilege to Gygi's allegations of defamation. Because the Court concludes Gygi's complaint does not state a claim for relief, the Court does not reach Defendants' statute-of-limitations and privilege defenses.

### I. Count I - Deprivation of Liberty Interest

The Due Process Clause protects a person's reputation and freedom to earn a living against governmental interference. *See* U.S. Const. amend. XIV, § 2; *Setliff v. Mem'l Hosp. of Sheridan Cty.*, 850 F.2d 1384, 1396 (10th Cir. 1988); *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004). To state a due process claim arising from government defamation, a plaintiff must show "defamation plus something more." *Al-Turki v. Tomsic*, 926 F.3d 610, 617 (10th Cir. 2019) (emphasis added). This "stigma-plus" cause of action, therefore, consists of "governmental defamation and [] an alteration in legal status." *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1184 (10th Cir. 2016) (internal quotation marks omitted). "Alteration" means "the plaintiff's alleged reputational damage must be entangled with some other tangible interests such as employment." *Id.* Four elements comprise an actionable claim: the statements (1) "impugn the good name, reputation, honor, or integrity of the employee"; (2) are false; (3) "occur in the course of terminating the employee or must foreclose other employment opportunities"; and (4) are published. *Workman v. Jordan*, 32 F.3d 475 (10th Cir. 1994). Here, Defendants focus on the third and fourth prongs.

### A. *Publication*

"Publication," in the due process context, means "to be made public." *Bishop v. Wood*, 426 U.S. 341, 348 (1976). Gygi concedes the LEA 90 and report to the DOJ were not made public. (Pl.'s Resp., at 4). Gygi instead argues "the LEA-90 was made available to the Public . . . when the LEA issued its NCA (notice of contemplated action) in July 2016 and thereby gave notice—to the public—of its intent to move forward." *Id.* The Court disagrees. Gygi pleads: (1) the LEA Director issued the NCA to *Gygi* based on the LEA 90's alleged false allegations; (2) Gygi received the NCA; and (3) DPD learned of the revocation proceedings. Even if true, the LEA's issuance of a notice to Gygi himself, and Gygi's receipt of the notice, fall short of the "actual [public] dissemination" the Tenth Circuit requires. *See Harris v. Blake*, 798 F.2d 419, 422 n.2 (10th Cir. 1986) (explaining if "forced withdrawal had been accompanied by public dissemination of the reasons" a remedy may be available under the due process clause).

To the extent Gygi suggests DPD's discovery of the LEA proceedings implies a publication, the Court is unpersuaded. The complaint fails to allege exactly what was communicated to DPD and from whom, how DPD received the information, and how the information was public. Even assuming the NCA came directly from the LEA to the DPD *and* contained Defendants' stigmatizing statements, that allegation does not plausibly establish publication. "An intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: 'to be made public.'" *Asbill v. Hous. Auth. of Choctaw Nation*, 726 F.2d 1499, 1503 (10th Cir. 1984) (citation omitted). Moreover, "intra-governmental" covers "communications between a municipal government and a state agency." *Alcorn v. La Barge, Wy.*, 2019 U.S. App. LEXIS 26248, at *12 (10th Cir. Aug. 29, 2019) (finding "no meaningful distinction between applying the 'intra-governmental dissemination' standard to communications

across units of government (such as between a city and county) and between a state and its sub-unites [municipalities] (such as here)").

In sum, the only facts in the complaint supporting publication are that the LEA issued *Gygi* the NCA on June 31, 2016, Gygi got the notice on July 1, 2016, and at some point DPD "learned of the license revocation proceedings." Moreover, even assuming DPD received the NCA, there are no facts supporting a *public* dissemination of Defendants' alleged false statements. The complaint, therefore, does not plausibly establish a due-process violation.

### B. *Injury*

To constitute a due process violation, the defamatory "statements must occur in the course of terminating the employee or foreclose other employment opportunities." *Renaud v. Wyo. Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000). This element is framed deceptively in the disjunctive. *See id.* at n. 1 ("[a]t first blush, it appears that [this factor] can be met either by statements made in the course of terminating an employee or, in the alternative, by any other statements that might foreclose other employment opportunities . . . [W]e conclude that [our case law] did not intend to create a test under which a liberty interest might be infringed by any defamatory statement that might foreclose future employment opportunities"). In other words, this element "should have been phrased conjunctively: the statement must occur in the course of terminating the employee and must foreclose other employment opportunities." *Castillo v. Hobbs Mun. Sch. Bd.*, 315 F. App'x 693, 697 (10th Cir. 2009) (citing *Renaud*, 203 F.3d at 728 n. 1). Here, Gygi's complaint fails to plausibly allege the injury requirement.

Gygi asserts the end of his employment with DPD represents the cognizable harm.[1] But DPD did not terminate Gygi: as pleaded, DPD informed Gygi, after consultation with the district

---

[1]To the extent Gygi alleges he also applied for other law enforcement jobs but did not get them because of the alleged false statements, this allegation does not support a tangible injury under the due process clause. *Sandoval v.*

7

attorney, that Gygi could not perform *all* his duties. Gygi believed he had no choice to resign, but that averment stops short of termination. *See Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (finding no cognizable injury where the plaintiff resigned under threat of termination). Contrary to Gygi's argument, even if a constructive discharge plausibly states a stigma-plus injury, the complaint fails to make plausible allegations in that regard. Constructive discharge turns on an objective standard, unrelated to what choices Gygi believed he possessed. *See Bennett v. Windstream Communs., Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015) (explaining "constructive discharge" means, "a plaintiff must show. . . she had no other choice but to quit" but that "the plaintiff's subjective views of the situation are irrelevant"). DPD's statement that Gygi could not complete *all* his duties—which itself implies a range of work Gygi *could* perform at DPD—does not give rise to a reasonable inference of constructive discharge.

Even construing Gygi's complaint to allege the LEA 90 contained false statements, those false statements made their way to DPD, and Gygi resigned in lieu of termination from DPD because of those statements, Supreme Court precedent forecloses Gygi's claim. *See Siegert*, 500 U.S. at 234. In that case, the plaintiff, a clinical psychologist, resigned from a government-run hospital under the threat of termination. The plaintiff secured a new position with an Army hospital, but was required to be credentialed to work there, which required input from his former supervisor as to his past performance. The supervisor wrote that the plaintiff was "inept and unethical, perhaps the least trustworthy individual I have supervised." The committee recommended against credentialing, the plaintiff was turned down for another federal position to

---

*Boulder Reg'l Communs. Ctr.*, 388 F.3d 1312, 1329 (10th Cir. 2004) (finding insufficient a claim that the plaintiff "applied for, and had been rejected from, approximately 100 positions for which she is qualified" and explaining the plaintiff must be "categorically ineligible for other employment.")

which he applied, and ultimately lost his federal employment altogether. He could not find work in the field thereafter. The plaintiff sued his former supervisor.

The Supreme Court held the plaintiff did not state a due process claim:

> The alleged defamation was not uttered incident to the termination of [the plaintiff's] employment by the hospital, since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later. The statements contained in the letter would undoubtedly damage the reputation of one in his position and impair his future employment prospects. But the plaintiff in *Paul v. Davis* similarly alleged serious impairment of his future employment opportunities as well as other harm. Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action.

*Id.* at 234. In interpreting *Siegert*, the Tenth Circuit acknowledged that such a case would have survived under existing precedent, but that *Siegert* without explanation foreclosed relief even though *Siegert* did not expressly overrule the previous line of cases. *See Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1154 (10th Cir. 2001) ("The Court in *Siegert* did not expressly overrule its prior precedents; however, despite its lack of explanation, the Court's holding in *Siegert* compels us to conclude that even though this action would have survived under [Supreme Court precedent predating *Siegert*], it has foreclosed relief under the Liberty Interest Clause of the Constitution on the facts alleged in this case.").

Gygi distinguishes *Siegert* as concerning only future employment, not the scenario here when *termination* at a different job occurs. But the plaintiff in *Siegert* did allege the loss of a second job as well as the loss of future employment prospects as the constitutional harm. *Siegert*, 500 U.S. at 232 (describing the plaintiff's due process allegations as "the loss of his [second] position . . . followed by the refusal of [another employer] . . . to consider his application for employment, and his general inability to find comparable work because of [the supervisor's]

letter"). Moreover, the case Gygi relies on to distinguish *Siegert*, *Spalsbury v. Sisson,* 250 F. App'x 238, 248 (10th Cir. 2007), illustrates a larger problem with Gygi's theory. In *Spalsbury*, the plaintiff claimed the police published false statements in arresting him. The Tenth Circuit empathized, having "no doubt that the criminal charges levied against [the plaintiff] damaged his reputation and contributed to him being fired" but concluded the plaintiff "was not employed by the [police department and its officers], and those defendants played no role in the decision to fire him." *Id.* Applying *Spalsbury* here, no cognizable injury occurred because even assuming DPD terminated Gygi, Defendants lacked control over DPD's decision making. Under his stated timeline, Gygi fails to establish he suffered adverse action "incident to" the challenged statements.

In sum, under either the publication or injury prong, Gygi's complaint fails to state a plausible claim for the deprivation of his due process rights.

## II. Equal Protection

The Fourteenth Amendment directs "all persons similarly situated . . . be treated alike." *A.M. ex rel. F.M. v. Holmes*, 830 F.3d 1123, 1166 (10th Cir. 2016) (internal quotation marks omitted). The Equal Protection Clause thus protects "every person within the State's jurisdiction against intentional and arbitrary discrimination . . ." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (internal quotation marks omitted). A plaintiff may assert an equal protection claim against a state actor as part of a "class," such as individuals belonging to a certain race, or as a "class of one." *A.N. v. Syling*, 928 F.3d 1191, 1196 (10th Cir. 2019) (citation omitted). Typically, a "plaintiff who alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" states a claim for violation of her right to equal protection." *Id.*

The analysis changes where local government acts not as a regulator but an employer. *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1254 (10th Cir. 2016) (explaining "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage [its] internal operations"). The difference means that in the public employment context, class-of-one claims—that the employee was singled out for arbitrary treatment not because of membership in a particular group—are not cognizable:

> the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship.

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605 (2008).

Despite *Enquist*'s prohibition, Gygi maintains his case falls outside the "employment context" because Defendants' statements occurred *after* he left employment at APD and *before* DPD hired him. This argument is not persuasive. As alleged in the complaint, the *sole* basis for submitting the LEA 90 was Gygi's actions as a law enforcement officer while employed at APD. APD received a complaint that Gygi used excessive force while an officer at APD following Castillo's arrest. Smith and Reyes investigated Gygi *internally* as an employee of APD; Raley ratified the investigation. It is technically true that Defendants submitted the LEA 90 after Gygi left APD's employ, but Gygi does not cite law that the timing transformed the context to remove it from public employment. The challenged acts, in short, occurred in Defendants' capacity as employers, not regulators.

In any event, the case law protects discretionary decision making. *See Herbert*, 828 F.3d at 1255 (citing *Flowers v. City of Minneapolis,* 558 F.3d 794, 799-800 (8th Cir. 2009) ("In light of *Engquist*, . . . we conclude that while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim"). Here, while arguably Defendants had to submit an LEA 90 under state agency regulations, the manner in which Smith and Reyes conducted the internal investigation and how they phrased the LEA 90 itself, the contents of which Gygi does not provide, was discretionary. *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1211 (10th Cir. 2004) (explaining "a certain degree of randomness and irrationality necessarily abounds at the bottom rung of law enforcement and areas of state and local decision making. . .[a] police officer may allow a car traveling 20 m.p.h. over the speed limit to fly right by, while stopping to ticket a car traveling only 15 m.p.h. above the limit[;] [t]he IRS may audit one taxpayer and not another with an identical, or more suspicious, profile") (internal quotation marks and citation omitted)). As alleged, the complaint does not state a plausible cause of action for violation of the Equal Protection Clause.

### III. Remaining Claims

Gygi argues his complaint states a claim of malicious prosecution under federal law. But there is no mention of this cause of action in the complaint, and counsel all but conceded the point during oral argument. The Court declines Gygi's invitation to construe his complaint to allege a new substantive count where none exists. *See* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the *claim* showing that the pleader is entitled to relief") (emphasis added). Gygi's counsel signed and drafted the complaint, and the pleading is not entitled to liberal construction as a result. *See Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) ("Although

plaintiffs' appeal is filed pro se, their original complaint was drafted by counsel and therefore is not entitled to the liberal construction we accord pro se pleadings"). To read malicious prosecution into the complaint here would be to improperly advocate on Gygi's behalf.

Defendants assert Gygi's complaint does not state a claim against the City of Artesia. Section 1983 authorizes damages only against "persons" who, under the color of law, violate constitutional rights. 42 U.S.C. § 1983. Because a municipality acts through its employees, it is not a "person" under the statute unless the plaintiff shows a city employee committed a constitutional violation and a custom or policy of the city "was the moving force behind the constitutional deprivation." *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (citation omitted). "[A] municipality cannot be held liable solely because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

Gygi's complaint does not reference "municipal liability." He does, however, allege Raley, the then chief of police for the APD and its "final policymaker," ratified the investigation into Gygi and the resulting false statements in the LEA. Although a police chief's ratification of the unconstitutional acts of a subordinate may constitute an actionable policy, municipal liability requires a plausible underlying claim of a constitutional deprivation as a prerequisite. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Because the Court concludes above that Gygi failed to plead a plausible due process or equal protection claims, Gygi's cause against the City of Artesia fails as a matter of law. *See id*.

### IV. Dismissal or Amendment

As explained above, Gygi's complaint is subject to dismissal. A dismissal under Rule 12(b)(6) is typically with prejudice. *Steele v. Federal Bureau of Prisons*, 355 F.3d 1204, 1212 (10th Cir. 2003). As an alternative to dismissal, Gygi seeks leave to amend his complaint in two

13

respects.  During oral argument, Gygi asked the Court to allow him to change the term "published" in paragraph 40 of the complaint so that the Court did not take December 14, 2015 as the date the statute of limitations started for his due process claim.  Second, in a footnote in his response, Gygi more generally asks that he be allowed to amend his complaint to add additional facts to state a plausible due process claim should the Court determine a deficiency exists.

Dismissal with prejudice is appropriate notwithstanding Gygi's request to amend.  As for the statute of limitations issue, the Court does not rely on timeliness as a basis for dismissal. Thus, amendment on that ground would make no difference.  In terms of his due process claim, Gygi cannot overcome the fact that Defendants did not terminate him—even assuming constructive discharge counts as termination under the Constitution and Gygi adequately pleaded constructive discharge—DPD did.  While DPD's discharge would constitute the "plus" had DPD uttered the alleged false statement, that is not the case here; nor could it be.  Gygi cannot therefore demonstrate that the defamation occurred *incident* to his termination.  The statements came well *after* he left employment with APD and before he ended employment with DPD.  In the end analysis, under no set of facts could Gygi succeed even if he were permitted to amend the complaint.

## CONCLUSION

For the above reasons, Gygi's complaint does not plausibly plead a constitutional violation.  Gygi fails to adequately allege the publication of the alleged defamatory statements or plausibly claim that his termination from DPD was incident to those statements.  Additionally, a class-of-one equal protection claim is not viable under the circumstances.  Because Gygi's complaint does not state the deprivation of a constitutional right, municipal liability against the

City of Artesia is a legal impossibility. Finally, dismissal with prejudice is warranted where amendment would not cure the complaint's defects.

**IT IS, THEREFORE, ORDERED** that Defendants' motion to dismiss (Doc. 6) is **GRANTED** in part and the complaint is **DISMISSED** with prejudice.

_____
KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent